## EDWARD DOWLING *vs.* JOHN SPEAR SMITH.

The constitution provides, that the clerk of the Superior Court of Baltimore city shall be subject "to be removed for *wilful* neglect of duty or other misdemeanor in office, *on conviction in a court of law.*" The 5th section of the act of 1856, ch. 286, enacts, that a "refusal or neglect" on the part of this clerk to give the bond prescribed by that act, "within thirty days after its passage, shall be deemed a disqualification within the meaning of the constitution," and directs his place to be filled by the judge of the court, as provided in case of a *vacancy* by the provisions of the constitution. HELD :

That this section of the act in question is unconstitutional, because it provides for the removal of the clerk in a *manner* directly in conflict with the one prescribed by the constitution. Before the clerk could be removed for such failure to give bond, he must be convicted therefor in a court of law of "*wilful* neglect of duty in office." *Per* LE GRAND, C. J., and ECCLESTON, J. *Contra, per* TUCK and MASON, J.

The 16th sec. of the 4th art. of the constitution makes all existing laws relating to the former clerks, applicable to the new clerks to be elected under the constitution, and gives the Legislature power from time to time to amend and alter them, and under this provision the Legislature had the power to pass the act of 1856, ch. 286, with the exception of its 5th section.

Where an act of Assembly requires something to be done within a certain time from its *passage*, the time is to be reckoned from the date of the *engrossment* of the law, and not from the date of its passage by the two houses of the Legislature; a law is not perfected until it has been *engrossed*. *Per* MASON, J.

APPEAL from the Superior Court of Baltimore city.

The act of 1853, ch. 409, required the clerks of the Court of Common Pleas, the Superior Court, and the Register of Wills, of Baltimore city, within thirty days after its passage, to file with the comptroller bonds in certain prescribed penalties, conditioned for the faithful performance of their duties, with sureties, the sufficiency of which was to be certified by the judges of the respective courts, the bonds to be approved by the comptroller, and, when so approved, to be filed in his office.

This act having omitted to designate the period of the duration of these bonds, and to provide for their renewal, the supplemental and amendatory act of 1856, ch. 286, was passed, the provisions of which, necessary here to be stated, are as follows:

The 1st section enacts, that each of the above named officers, who may not have given his official bond within two years past, "shall, within thirty days after the passage of this act, file with the comptroller a bond," as prescribed by the act of 1853.

The 4th section provides, that when the bond is inspected by the judge, and is deemed good and sufficient, and is so certified, it shall be forthwith entered among the proceedings of the court, and sent to the comptroller for his approval, who, when it is approved, shall send to the judge a certificate of the fact, which shall be entered among the proceedings of the court in which the bond shall have been recorded.

The 5th section, which is similar in this respect to the 4th section of the act of 1853, declares: "That a refusal, or neglect on the part of," any of these officers, "to comply with the requirements of this act within thirty days after its passage, shall be deemed a disqualification within the meaning of the constitution, and thereupon their places shall be filled according to the provisions of the fourteenth and eighteenth sections of the fourth article of the constitution, and subject to the term and service therein prescribed." (These sections of the constitution give the judge the power to appoint a clerk, in case of a vacancy, until the next general election.)

The 6th section provides, that the act shall take effect "*from the date of its passage.*" It was passed by the House of Delegates on the 7th, by the Senate on the 8th, and *engrossed* on the 10th of March 1856.

Dowling, the appellant, the clerk of the Superior Court of Baltimore city, presented his bond to the judge of that court, on the night of the 7th of April 1856, for his certificate as to the sufficiency of the sureties. The judge gave a certificate that he had "examined the said sureties, who made oath, in due form of law, that they are able and sufficient," &c. The

bond was delivered to the clerk on the morning of the 8th, and on the same day was sent by mail to the comptroller at Annapolis, and was received at his office on the morning of the 9th of April. That officer declined to approve the bond, because it was not filed with him within thirty days from the passage of the act of 1856. He also objected that the certifi-. cate of the judge did not state that the sureties to the bond are sufficient. This latter difficulty was obviated by an amendment to the certificate, but the comptroller still withheld his approval, upon the ground that the bond had not been filed in time.

The court, (LEE, J.,) then laid a rule upon Dowling, to show cause why he should not be declared disqualified, within the meaning of the constitution, to hold his office, and why his place should not be filled according to the constitution and the act of 1856. Dowling, in his answer to this rule, denies that he has been convicted, or has been guilty of any wilful neglect of duty or of any misdemeanor in office as clerk, and insists that he has not become liable, within the true meaning of the constitution, to removal from his office, the franchise of which he claims, under the sanction of the constitution, as a protected and vested interest, indefeasible save where, by the rule and ordinance of that constitution, he shall be judicially established to have forfeited it, and denies the authority of the court to challenge or control his constitutional claim and franchise, and its right to lay the rule or arraign him for any supposed disqualification for tenure of his office. The court, immediately upon filing of this answer, passed an order declaring the office vacant.

Shortly afterwards the court passed another order, appointing the appellee, Smith, clerk to fill the vacancy, who, having duly bonded, applied to the court for an order upon Dowling to compel delivery of possession of the office. Upon this application the court passed an order requiring delivery as claimed, unless cause be shown to the contrary.

In his answer to this order Dowling insists upon his former grounds of defence, denies the constitutionality of the 5th section of the act of 1856, and, even conceding that it was con-

stitutional, denies that the action of the court under it was warranted by it. He also charges, that as soon as he had *knowledge* of the *existence* of the act, he did all in his power to comply with its requirements, and insists that he did file his bond within time, as that act is to be construed as having passed on the 10th of March, and not on the 8th of March 1856.

The court then passed an absolute order, requiring Dowling to deliver possession of the office to Smith. From this order, as well as from the previous order declaring the office vacant, Dowling appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and MASON, J.

*Charles J. M. Gwinn* for the appellant.

The two orders passed by the Superior Court raise the single inquiry, material to this case; that is, whether that court had the right to declare the office of its clerk vacant, as, by the record, appears to have been done?

The appellant was duly elected clerk of the Superior Court of Baltimore on the first Wednesday of November 1851, under art. 4, secs. 14, 24, of the constitution of Maryland, for a term of six years. Having "duly qualified" according to law, under art. 4, sec. 16, he entered on the discharge of his duties. Now there are two inquiries to be made here :—1st. What was the form of qualification necessary? 2nd, (and this is the gist of the case now pending,) What was the legal effect of his fulfilment of the qualifications, declared to be necessary to his perfect tenure of his office.

Upon his election he was bound to take the oath prescribed by the 9th sec. of the 1st art. of the constitution,—of fidelity to the constitution and laws, that he had not been guilty of bribery, and would not receive the profits of any other office during his term. When this oath was taken he was *qualified to hold the office.* The giving of the bond was not a qualification for office, and there is nothing in the constitution to make it so. The words, "qualified according to law," in art. 4, sec. 16, can, of course, refer, in Dowling's case, only

to such measures as the law *then* required of a clerk, before he could enter upon his office. As the law then stood, the clerk of the Superior Court bonded under the act of 1800, ch. 82, which was amendatory of the acts of 1716, ch. 1, and 1742, ch. 10. The first and last of these acts assumed that the clerk was qualified to act even if he did not bond, as they required. They made bonding necessary, however, to the officer, by declaring, (1716, ch. 1, sec. 3, 1800, ch. 82, sec. 3,) that he should not have the right to collect his fees unless he did bond as they required. If the act of 1742, ch. 10, bears a contrary interpretation, it is superseded by that of 1800, ch. 82. The officer was duly qualified to act as clerk under these laws,—he was civilly responsible for malconduct in office, and criminally responsible for offences committed by him as an officer—but he could enjoy no emolument from the office unless he bonded. The law of 1823, ch. 195, did not alter this state of things. It only provided an additional safeguard, by declaring that the clerk should bond in every second year, and by directing his punishment by fine if he did not. The omission to give the bond was no disqualification; for it would have been folly to provide that he should be punished for not giving the bond as clerk, if he ceased to be clerk when he did not give the bond. The law of 1840, ch. 52, only prescribed the time at which the bond should be renewed.

When the new constitution was adopted, the words, "when duly elected and qualified according to law," meant only, qualified according to the requirements of the constitution as the supreme law of the State, for there was not then in force any *statute* which made a compliance with its terms necessary to a qualification to office.

Having become thus legally qualified, it was not competent for the Legislature to add to the tenure of his office any qualification except that which the constitution provided for. The Legislature might make the forfeiture of the office a part of the punishment which it imposed for any malfeasance or non-feasance, but it could only do this by prescribing it as a punishment to be inflicted *after a conviction*. 3 *Cow.*, 686, *People vs. Barker*, and the same case in 20 *Johns.*, 457. The

act of 1853, ch. 409, was a departure from this well settled rule of law, unless it is construed in subordination to it and to the constitution.   It provided that new bonds should be given by the clerk of the Superior Court, and by the other officers therein named, within thirty days after its passage, and declaring that his refusal or neglect to do so *"should be deemed a disqualification within the meaning of the constitution;* and *thereupon* their places shall be filled *according to the provisions of the 14th and 18th sections of the 4th art. of the constitution."* This law did not provide for a renewal of the bond, and the Legislature assumed that the law of 1823, ch. 195, was repealed by the act of 1853, ch. 409, by the preamble of the law of 1856, ch. 286, which is the immediate subject of this controversy.   This law of 1856, ch. 286, is, in its 5th section, a repetition of the words of the act of 1853, ch. 409, sec. 4, under which the clerk of the Superior court had bonded. The re-enactment of the portion of the former law prescribing its penalty does not help the construction of the law.   It is now for the first time, when the Superior Court has undertaken to act under it, material to construe its correctness.

Concede now that the clerk of the Superior Court did not bond within thirty days, as required by the law of 1856, ch. 286.   What is the effect of that failure to comply with the requirements of the law of 1856?   The law says, it *"shall be deemed a disqualification within the meaning of the constitution, and thereupon his place shall be filled according to the provisions of the 14th and 18th sections of the 4th art. of the constitution."*   Now what are disqualifications within the meaning of the constitution, and how are they ascertained to exist?   For disqualification here must be construed to mean, *acts that work a forfeiture of the office, its tenure having commenced.*   The word occurs several times in the new constitution.   In sec. 29, art. 3, in case of "Disqualification" of a member of the Legislature a new election shall be ordered. The only cause of *disqualification* would seem to be his election to the Congress of the United States, which vacates his former seat.   It is stated in its meaning, though not in terms, in art. 3, sec. 36, where a person who shall fight a duel, or who shall

send a challenge or accept one, shall be incapable of *holding* any office of profit or trust. It need not be argued here, however, that the forfeiture of an office held by a person who had done any of these acts *could only follow a conviction and be a part of, or a consequence of, the sentence.* The word occurs in art. 4, sec. 20, in the provision for sheriffs, and again in art. 4, secs. 25, 26, but no interpretation is given to its meaning.

From these clauses, therefore, we can derive no light. We may, indeed, assume that the word was not used with any definite idea of its legal application to the circumstances of which it proposed to treat. The word drifted into sec. 29, art. 3, and sec. 20, art. 4, from the old constitution, where it had a meaning, and where it meant a *property* qualification.

We are obliged to construe the words, "shall be deemed a disqualification within the meaning of the constitution," in such manner as shall make them harmonise with the process, by which, in the new constitution, it is provided that the clerk of the Superior Court shall become disqualified for office; that is, by regarding his neglect or refusal to give the bond required by the act of 1856 as a wilful neglect of duty, or as a misdemeanor in office, for which, upon conviction therefor in a court of law, he may, by the judgment of such court having jurisdiction, be removed from office. A legal vacancy then occurs, and the office may then be filled under the provisions of the 14th sec. of the 4th art. of the constitution. For, to sum up the argument, the law of 1856 does not say that the clerk refusing or neglecting to bond shall be *thereby* disqualified. If it did, we might argue the constitutional power of the Legislature to create a defeasance of a vested office by superadding a qualification, superior to, and not required by, the constitution. It does not say that by his neglect or refusal he shall be deemed to have *resigned* his office, which is the more common method, but one equally liable to objection and comment. But the act says that the clerk shall be deemed to be "disqualified within the meaning of the constitution," and the public authorities are, therefore, left by the law to ascertain, in the mode in which the constitution has pointed out, *the fact of his neglect or refusal;* and it is the duty of the

court before which this question is tried, if the wilful neglect or refusal to bond is ascertained, to declare such disqualification in the only legal mode—that is by its formal judgment and act of record.

An argument will be drawn on behalf of the appellee from the language used by the Court of Appeals, in the case of *Thomas vs. Owens, 4 Md. Rep.,* 224. In reply to the sentence referred to it need only be said that, without discussing whether the law there announced is applicable to the case of the Comptroller or Treasurer, or not, it certainly cannot, either upon reason or precedent, be considered as binding upon the court in the decision of this case. In general, even, it must be said that the doctrine of this isolated passage, if insisted upon, and engrafted upon our law, would be fraught with great evils. If the non-compliance by a constitutional officer with all legislative requirements not inconsistent with the tenure of his office, is to be deemed a resignation, he is at the mercy of every legislative body that may choose to set traps for him in the discharge of his official duty. The least omission to perform some statutory act, may be tried in the closet of an executive, and an office may be declared vacant as effectually by his *ex parte* decision, as it could be by the judgment of a court for some well ascertained and undoubted misdemeanor.

If the Legislature can enable a court to disqualify an officer who does not file his bond in a given time, without enabling him to show, by process of a jury trial, that he was prevented by the act of God even, can it not enable a governor to pronounce a judge's disqualification, who shall not literally adhere to every minute process in the administration of justice which it may see fit to enjoin? If in office he had committed the grossest corruption, he could claim, under the bill of rights, to be informed of the accusation against him, and to have the benefit of a trial by jury, before the sentence of deprivation of his office could be made against him. But if such a construction holds, as is insisted on here, for the *simplest non-feasance,* he may be tried he knows not when, and he knows not where, without counsel, before one to whom he is not, by the common law, or the constitution, amenable, and he may be as effectu-

32    v.9

ally injured in the loss of credit, name and office, as if he had stood at the bar as a criminal, and had been so adjudged.

The argument to be derived from the common law, and from the practice in the English courts, in cases of forfeiture, are conclusive upon the point, that even where there is no doubt that a forfeiture has occurred, it cannot be taken advantage of except by the intervention of a jury. In case of self-murder even, however apparent the fact may be, no part of the personal estate is vested in the king before the self-murder is found by an inquisition. 13 *Viner's Abr., title, Forfeiture,* 451. 1 *Hawk. P. C.,* 68, *ch.* 27, *sec.* 9. Things even causing death, which may come properly within the description of *deodands,* are not so without the finding of a jury. 1 *Chitty's Blacks.,* 302. 3 *Inst.,* 57. So in treason under statutes 5*th and* 6*th Edw.* 6, *ch.* 11, *sec.* 9, and 26*th Hen.* 8, *ch.* 13, *sec.* 4, all lands, tenements and hereditaments were *forfeited,* yet an inquisition of office was necessary to vest them in the king, and this security continued until 33 *Hen.* 8, *ch.* 20, *sec.* 3, which expressly dispensed with the necessity of an office or inquisition. And in case of felony goods are not in the king without an office found of such felony, *because the property cannot alter without matter of record.* 5 *Coke,* 109, *Foxley's case.* 4 *Bac. Abr.,* 342, *title, Forfeiture, letter B.* So the king, even where his tenant *in capite* has alienated, is not in possession till the alienation is found by office. 16 *Viner's Abr.,* 80. Where a man is attainted the king cannot enter without office. 16 *Viner's Abr.,* 80. So it is generally said that where an officer, who holds his office by patent, commits a forfeiture, he cannot, regularly, be turned out without a *scire facias,* nor can he be said to be completely ousted or discharged without a writ of discharge; for his right appearing of record the same must be defeated by matter of as high a nature. 7 *Bac. Abr.,* 323, *letter M.* 2 *Chitty's Blacks.,* 199. 8 *Coke,* 14, *The Prince's case.* 9 *Coke,* 98, *Sir Geo. Reynel's case. Dyer,* 198, *Rex vs. Eston. Dyer,* 211, *(a,) Sir Robert Cheston's case.* 2 *Term Rep.,* 554, *King vs. Amery. Siderfin,* 81, *Sidney Beere vs. Windebanke.* Where in appeal the defendant waged battel, and was van-

quished, but not by death, by which judgment was given that he be hanged, for without judgment the lord cannot have the escheat. 10 *Viner's Abr.*, 140, 141. *Coke Litt.*, 390, *(b.)* So in this country, where a statute imposes a forfeiture by way of a penalty, the law does not vest them in the party to whom the goods and chattels are given, without a judicial proceeding declaring the forfeiture. 10 *Wend.*, 266, *Fire Department vs. Vip.*

Finally, it would seem that this bond was rendered in time, both from the certified copy of the law, and from the printed volume which states the law to have been passed on the 10th of March 1856.

*J. Meredith* for the appellee,—after calling the attention of the court to the 4th point on the appellant's brief, that the act of 1856, though passed by the House of Delegates on the 7th, and by the Senate on the 8th, of March, did not become an operative law till the 10th of the same month, when it was engrossed,—stated, that as the point had been left entirely untouched by the opening counsel, he presumed that it was abandoned, and though prepared to argue it, would, on that presumption, pass it by without remark. *Mayer* for the appellant, observed, that the point had not been abandoned. *Meredith* then stated, that in that case he had a right to require an opening, and would give way to the counsel, or his colleague, for that purpose. This offer being declined, he then observed, that should the point be raised in the concluding argument, the counsel of the appellee would claim the right to reply.

He then proceeded to say, that the case involved a question of legislative power. The constitutionality of an act of the General Assembly is the main subject for discussion; and the court need not to be reminded, that of all subjects of judicial cognizance, it demands the gravest and most considerate attention. If he had entertained a doubt of the validity of the act of 1856, it would have been removed by the decision of the court, in *Thomas vs. Owens*, 4 *Md. Rep.*, 189, on the authority of which he should ground the argument he proposed to offer.

That, the court would recollect, was a controversy between the Comptroller and Treasurer of the State, as to the time when the salary of the former legally commenced. The 1st sec. of the 6th. art. of the constitution, creates a Treasury Department, consisting of those two officers, and amongst other provisions, requires them to "take such oath, and enter into such bond, for the faithful discharge of their duties, as the Legislature shall prescribe."

The only qualification required by the constitution, for the office of Comptroller, is that contained in the 4th sec. of art. 1, which directs that the oath, the formula of which is given, shall be taken by every person, elected or appointed to any office of profit or trust, before he shall enter on its duties; and on neglect or refusal to take such oath, he shall be considered as having refused to accept the office, and a new election or appointment shall be made, as in case of refusal or resignation.

The appellant, Thomas, was elected Comptroller on the 5th of November 1851, and qualified by taking the oath on the 10th of December, from which time he claimed salary.

At the session of 1852, an act was passed by the General Assembly, in execution of the powers granted by the section of the constitution before referred to, which prescribed the oath, and the penalty and condition of the bond to be given by the Comptroller and Treasurer; and provided that in case of neglect or refusal to give bond, within twenty days after a demand by the Governor, "*such neglect or refusal shall be deemed a disqualification within the meaning of the constitution;*" and forthwith a fit and proper person shall be appointed to fill the vacancy. Thomas took the oath and gave the bond on the 28th of February 1852, and it was contended on the part of the Treasurer, that his salary commenced on that day.

The court decided, that he became duly qualified for office, by taking the oath prescribed by the constitution, and was therefore entitled to salary from that period; that all which was required of him was to qualify according to existing laws, and having done so, he was to be considered as rightfully in office; that the authority given to the Legislature to prescribe an oath, and require a bond, not demanded by the constitu-

tion, was meant to guard against consequences which would have resulted from the operation of a well known and universally acknowledged principle of law:—that when a constitution defines the qualification of an officer, it is not within the power of the Legislature to change or superadd to it, unless the power be given expressly, or by necessary implication. The constitution does contain an express grant of such a power, and therefore the act of 1852 was rightfully passed, and the Comptroller was bound to obey its requirements, as he would be bound to obey any future law upon the same subject; for the exercise of the power is not confined to its first exertion by the Legislature, but extends to all time; and that if the Legislature should hereafter alter the oath or bond which the act of 1852 prescribes, a failure to comply with such new law would be held a resignation of office.

These are the principles of law, thus sanctioned by the authority of the court, which we hold to be decisive of this case. We admit, that the legislative department of the government is the depository of those powers only that are conferred upon it by the constitution, either expressly, or by necessary implication. And we admit still further, that no power can be implied which the constitution directly prohibits, or which is repugnant to any of its provisions.

The act of 1856, the constitutionality of which is denied, requires new bonds to be given by the clerks of the Common Pleas, and of the Superior Court, and by the Register of Wills, of Baltimore city, within thirty days after the passage of the law; and repeating the language of the act of 1852, requiring bonds from the Comptroller and Treasurer, declares that a refusal or neglect shall "be deemed a disqualification within the meaning of the constitution," and that thereupon the office of the uncomplying clerk shall be filled according to the 14th and 18th sections of the 4th art. of the constitution.

As in the case of the Comptroller and Treasurer, there is no other qualification for the office of clerk than that prescribed by the 4th sec. of art. 1, namely, the oath of office. But this omission is explained by the 16th sec. of art. 4, which declares that the clerks of the several courts throughout the State,

"when duly elected *and qualified according to law,* shall have the charge and custody of the records, and other papers belonging to their respective offices." By what law? By the law in force for the time being. This is palpable from another provision of the same section, which declares, that all laws then in force relating to clerks, shall "be applicable to the clerks respectively of the Court of Appeals, the Circuit Courts, the Court of Common Pleas, the Superior Court, and the Criminal Court of Baltimore city." Whatever qualifications then were required by these laws, or any of them, the clerks first elected under the new constitution were bound to conform to, in order to be "qualified according to law."

Now what laws requiring bond, with security, to be given by the clerks of courts, were then in force?

In 1742 the Provincial Legislature passed an act, (ch. 10,) providing, that every county clerk should give bond, with sufficient securities; that it should not be lawful for the clerks then in office, or to be thereafter appointed, to take upon themselves the keeping of the records, or to receive any of the fees of office, till they had entered into bond with the prescribed conditions; and that these bonds should be given by the clerks then in office, within a time limited by the act, and should be renewed as often as the county courts respectively might see cause, in reference to the solvability of the sureties.

The act of 1856, now, in question, is substantially this act of 1742, which was in force when the first constitution was adopted, and remained in force and unchanged till 1800. (*State vs. Wayman,* 2 *Gill & Johns.,* 285.)

In 1800 an act was passed, (ch. 82,) increasing the penalty, and altering the condition of the bond prescribed by the act of 1742, but containing no repeal of that law. Like that act, it applied to clerks in office, as well as those to be subsequently appointed, and was also limited to take effect on a day named. It provided, that it should be unlawful for clerks to receive fees of office until they had entered into bond; and left the 4th sec. of the act of 1742 untouched, which, as has been seen, authorised the judge, in his discretion, to demand a new bond.

To this discretionary power, another safeguard was added by the act of 1823, ch. 195, which required a renewal every second year, under a penalty of $1000. But this last act contained no repeal of the act of 1742, or that of 1800, and both of these being affirmative statutes, it might well be questioned, if the point were at all material, whether the money penalty should not be construed as cumulative upon the disqualification provided for by both the former acts.

Thus then stood the law when the present constitution went into operation, requiring bond with securities, renewable every second year. No clerk therefore could be, in the language of the constitution, "qualified according to law" until he gave such bond. The appellant was elected clerk of the Superior Court at the first election in 1851, and having given bond, was "qualified according to law."

At the session of 1853, an act was passed requiring new bonds to be given, within thirty days after its passage, by the clerks and register of the courts in the city of Baltimore, under penalty of disqualification. This law the appellant also conformed to. But the act of 1853 containing no provision for the renewal of the bonds which it required, the amendatory act of 1856 was passed to supply that omission, by requiring new bonds to be filed, and to be renewed every two years, under the same penalty. The appellant failed to comply with this law, within the time limited for filing a new bond; and the judge of the Superior Court, being notified of that fact by the Comptroller, proceeded, under the express requirements of the act, to declare the office vacant, and to appoint a successor.

Assuming the constitutionality of the act, it is clear, that after a failure to comply with its terms, Dowling was no longer "qualified according to law," but disqualified, not only within the meaning of the constitution, but by the very words of the 16th sec. of the 4th art., which gives the charge and custody of the records and other papers of the office, only to a clerk "duly qualified according to law." The disqualification is not by force of the act of 1856, but is declared by the constitution.

It is plainly undeniable, if the act of 1856 does not transcend the limits of the legislative power, that by this failure to comply

with its terms, the appellant was no longer "qualified according to law," but disqualified, not only within the meaning, but by the express words of the 16th sec. of the 4th art. of the constitution.  He had no longer a legal right to "the charge and custody of the records and other papers belonging to the office."  "Suppose," said Judge Eccleston, in the case of *Thomas vs. Owens,* "suppose that subsequent to the act of the Legislature, the Comptroller had refused to comply with its provisions, insisting that he was already in office, and would perform its duties, and demand his salary, upon the ground that he had taken the oath directed in the 1st article, could it be successfully maintained that he had a right to do so?  I think not.  If not, then why?  It could only be for the reason that he was not qualified.  And yet in the supposed case every requisite to constitute him Comptroller would exist, except a compliance with the legislative act."

Now to what extent, and within what limits, does the constitution confer legislative power?  The third article of the Declaration of Rights—which is a part of the organic law, as supreme and obligatory as the constitution itself,—(1 *Gill & Johns.*, 472,)—expressly subjects all laws in force "to the revision of, and amendment or repeal by, the Legislature."  And the 16th sec. of the 4th art. of the constitution, recognises this power over the laws relating to clerks throughout the State then in force, by declaring that they "shall be applicable to the clerks respectively of the Court of Appeals, the Circuit Courts, the Court of Common Pleas, the Superior Court, and the Criminal Court of Baltimore city, *until otherwise provided by law.*"

"Whenever a question arises concerning the constitutionality of a particular power, the first question is, whether the power be *expressed* in the constitution?  If it be, the question is decided.  If it be not expressed, the next inquiry must be, whether it is properly an incident to an express power, and necessary to its execution?  If it be, then it may be exercised by Congress.  If not, Congress cannot exercise it."  (3 *Story's Comm.*, 114.)  Now taking the 16th sec. of the 4th art., with the article in the Declaration of Rights, it amounts to

Dowling *vs.* Smith.

this, that the Legislature shall have power to revise, amend, or repeal all laws relating to clerks. The power then is expressed:—it is a general power, and necessarily a continuing power. It does not however execute itself, but is to be executed only by legislation." "What is a power," says the same learned jurist, "but the ability or faculty of doing a thing? What is the ability to do a thing, but the power of employing the means necessary to its execution? What is a legislative power, but the power of making laws? What are the means to execute a legislative power but laws? In a word, the powers given by the constitution imply the ordinary means of execution; for without the substance of the power, the constitution would be a dead letter." (3 *Comm.*, 109.) In order, however, to avoid all doubt or disputation as to the admissibility of implied powers, as well as to guard against their abuse, the 2nd sec. of the 10th art of the constitution declares, that "the Legislature shall have power to pass all such laws as may be necessary and proper for carrying into execution the powers vested by the constitution in any department or office of the government, and the duties imposed upon them thereby." This is almost a literal transcript of the last clause of the 8th sec., art. 1, of the constitution of the United States, and whatever doubt may have existed as to its true interpretation, was removed by the judgment of the Supreme Court, in *McCulloh vs. The State of Maryland*, 4 *Wheaton*, 316. It was insisted in that case, that the language of the clause was to be rigorously construed; that the word "necessary" was to be taken as equivalent to absolute and indispensable necessity; that it was to be considered as controlling the whole sentence, and as limiting the right to pass laws for the execution of the granted power, to such as without which the power itself would be nugatory. The court, however, rejected this narrow construction, and, by a masterly argument, demonstrated the necessity of giving it a liberal interpretation. They decided that the word as used in the clause meant nothing more than needful, appropriate, suitable, fitted to the object or end proposed; that the court when inquiring, as it had a right to do, whether Congress had made a selection of consti-

tutional means to execute the granted power, would compare the law with the constitution, not in order to ascertain whether better means might have been chosen, but to see whether those which have been chosen have a natural connection with the power granted; whether they are adapted to give it effect; whether they are appropriate means to the end.   For the choice of the means,—the degree of the necessity, is for the Legislature alone to decide.   The court cannot inquire into these without passing the line that circumscribes the judicial department, and treading on legislative ground.

There being then an express grant of power in the present case, to revise, amend or repeal all laws relating to clerks, the only question to be considered is, whether the act of 1856 was a necessary and proper law to carry that power into execution? Among these laws, none appear to have been regarded as more important than those requiring security for the due and faithful discharge of the duties of an office of such great public trust. From the earliest period of Maryland legislation, as we have seen, laws intended to effect this object have been enacted, and from time to time revised and amended, at the discretion of the Legislature.   The power was never questioned under either of the preceding constitutions, though neither of them contained any express grant of authority; it was conceded to be inherent.   The act of 1853 effected no change in the character and nature of the qualification required by previous laws. It did not substitute another thing in the place of the bond: it did simply what the act of 1800 had done, increase the penalty and alter the conditions.   The act of 1856 simply re-enacted that of 1823, requiring a renewal every two years.   The object of both acts was to protect public and private interests. The clerks of the courts established for the city of Baltimore, were invested with much higher and more important trusts than their predecessors under the former constitution.   They were receivers of large portions of the revenues of the State; and the great increase of responsibility, in this and other respects, made a change of penalties a wise and salutary precaution.   The preamble to the act of 1856 manifests the wisdom and expediency of these laws.

Dowling *vs.* Smith.

Now the means to secure obedience to these laws was indispensable to their efficiency. Following the precedent of the act of 1852, relating to the office of Comptroller and Treasurer, and copying the very words of its 7th section, both these laws inflict the penalty of disqualification for neglect or refusal to comply with their provisions, as did the act of 1742. Can the right to do so be questioned? The right to punish infractions of law is incidental to the power of legislation; it is a means for carrying that power into excution, and is conducive to its beneficial exercise. The penalty of disqualification resulted from the power granted, was adapted to give it effect, was an appropriate means to the end: was "necessary and proper," in the language of the 2nd sec. of the 10th art., according to what we have seen to be the true and settled interpretation of those words. If this be so, then all judicial inquiry, whether better means might have been chosen, is forbidden. "The choice of the means," say the Supreme Court,—"the degree of the necessity is for the Legislature alone to decide. The court cannot inquire into these without passing the line that circumscribes the judicial department, and treading on legislative ground."

But, nevertheless, the means must be constitutional,—neither expressly prohibited by it, or repugnant to any of its provisions; that we freely concede. It is not pretended that there is any express prohibition against the infliction of the penalty of disqualification to be found in the constitution. On the contrary, the 16th sec. of the 4th art. presupposes it, as does the 20th sec. of the same article, in the case of sheriffs. But a repugnancy is supposed to exist between this penalty and the 14th sec., which provides, that clerks shall be subject to removal "for wilful neglect of duty, or other misdemeanor in office, on conviction in a court of law." And the argument is, not merely that this is the only mode by which a clerk can be *removed* from office, but by which he can *forfeit* his office. Removal and forfeiture are very distinct things. What is a misdemeanor in office? It is clear that the convention used the word in its technical sense. It declares "wilful neglect of duty" to be a misdemeanor; and so it is, indictable and

punishable at common law. 1 *Stark. Crim. Pl.*, 149. The words, "or other misdemeanor in office," necessarily mean misdemeanor *ejusdem generis*,—indictable at common law, such as all unlawful acts done *colore officii*,—extortion, corruption, falsification of records, and other offences of a similar character. The convention did not intend to create new misdemeanors, unknown to the common law, but merely to make forfeiture of office cumulative upon fine and imprisonment. Can it be seriously contended, that neglect or refusal to give an official bond, in order to be qualified to hold office, is a misdemeanor in office? Where is the precedent for such an indictment to be found? There is no repugnancy. The constitution itself prescribes the remedy. Clerks not "qualified according to existing laws," shall not have the charge and custody of the records and other papers belonging to the office; in other words, shall be disqualified from holding office. Can a clerk be said to be "qualified according to law," who refuses or neglects to give a bond demanded by law as a qualification for office? If after election he refuses or neglects to give the bond required by the existing law, he cannot enter into office, because he is not qualified according to law. In like manner, if after qualifying according to existing laws, he enters into office, and a law is subsequently passed, in the rightful exercise of the legislative power, requiring a new bond, which he refuses or neglects to give, this court has already decided, in *Thomas vs. Owens*, that he is forbidden by the constitution to continue in office, and precisely for the same reason, because he is no longer "qualified according to law."

· In truth, the acts of 1853 and 1856 were, in regard to disqualification, entirely supererogatory; they simply gave the true and unmistakable construction of the 16th sec. of the 4th art.; they were declaratory, and nothing more. Strike the penalty out of both of them, and the same consequence would follow. The disqualification is the penalty imposed by the constitution itself.

*Reverdy Johnson* on the same side.

The appellant must make good one of two propositions:

1st. That the 5th section of the act of 1856, ch. 286, is *unconstitutional*, or 2nd. That the mode adopted by the judge of the Superior Court in vacating the office and appointing a successor to Dowling *was not warranted by the act*.

1st. Had the legislature the power to pass this law? The argument on the other side goes to the extent, not only of denying that the constitution contains any provision requiring such a bond, but also that it has put it out of the power of the Legislature to pass a law requiring such bonds to be given. In construing the constitution one rule of construction is applicable, viz., that all fit subjects of legislation are within the legislative department, unless vested elsewhere or expressly prohibited to the legislature. The rule of construction of State constitutions is entirely different . from that of the constitution of the United States. In the latter you look to see if the particular power is among the *enumerated powers granted* to Congress; in the former you look to see if it is *legislative in its character*, and whether it is *prohibited* to the Legislature. There is no doubt that the law in question, in the absence of any *prohibition* to the Legislature to pass it, is a power which can only be exercised by the Legislature. The form and character of the bonds which shall be given by the clerks who are *revenue officers* of the State, is a subject exclusively appropriate to statutory provision. The object to be attained is security to the public revenue against the danger of *negligence* in the *revenue* officer, and there is just as much necessity to require the *renewal* of the bond as to require a bond in the *first instance*. Is there then any provision in the constitution which *prohibits* the Legislature from passing this law? In my judgment clearly not. The convention knew that the clerks of the old county courts were required to *give bonds*. Did they mean to put the clerks to be elected under the constitution in a different predicament? If they did they intended these clerks should not give *bonds at all*. The 4th section of art. 1, prescribes the oath to be taken by all officers before entering upon the discharge of the duties of their offices. If this alone gives the officer a right to his office, independent of any subsequent legislation, then all the subsequent laws in regard

to bonds are at *an end.*   Not only so, but if this *oath* is all that is necessary to entitle the appellant to his office, then no bond could be required, even under *antecedent laws.*   But you must take this constitution as a *whole* and construe all its provisions together.   The 16th sec. of art. 4, makes the *clerks* therein referred to, subject to *existing laws, "until otherwise provided by law."*   This provision keeps in force all the previous laws relating to clerks, until amended or repealed by subsequent legislation.   The 3rd art. of the Declaration of Rights, also, continues in force all laws existing at the date of the constitution, except such as are repugnant thereto.   These provisions, taken together, show, that the officer *taking the oath* must also conform to existing laws, and perform such duties as the *legislature* may *from time to time prescribe.   7 Md. Rep.,* 477, *Marshall vs. Harwood.*   The act of 1853, ch. 409, containing the same provision as the act under consideration, is one of *contemporaneous construction.*   I submit, therefore, that the Legislature had a clear right to *pass this law.*

2nd.  Was the mode adopted in this case, to vacate the office, warranted by *the act and the constitution?*   The 14th sec. of art. 4, makes the clerk subject to be *removed* for wilful neglect of duty, or other misdemeanor *in office,* on conviction in a court of law.   It also provides, that in case of a vacancy the judge shall have the power to appoint until the next general election of delegates.   The law, in question, provides, that a *failure* to comply with its provisions shall be *deemed* a *disqualification* within the meaning of the constitution, and gives the judge the power to fill the vacancy until the next general election. Now it is said on the other side, that there must be, under the constitution, a *conviction* in a court of law before a removal from office can take place.   But by the law in question, the *bond* is to be approved by the judge and comptroller, and then entered of *record* in the Superior Court.   If the clerk does not comply with these provisions within thirty days from the passage of the law, he is not, under the law, any longer *the clerk.*   Even, in the absence of the 5th section, if the time had passed and he had failed to give the bond, he would be no *longer clerk,* because these are *conditions precedent* to his

holding the office; it is a *failure to qualify* and he is just as much out of office as if he had failed to comply with any *antecedent law.* If the legislature had the power to require the execution of the bond they could declare the *consequences* of a *failure* to execute it. Is he to remain in office until the grand jury indict him, or the petit jury convict him, and the Court of Appeals determine the law? The question is, were the Legislature *bound* to leave the officer in office until these questions should be *determined?* Refusal to qualify himself for an office is not a *crime* for which a party can be *indicted.* How can it be said that the *refusal* to give a *bond* is a *crime* for which a man can be indicted? But again, to sustain an indictment under this clause of the constitution, the party *must* be *in office.* But if he fails to give bond he is not *in office* and could not be guilty of any offence *in office.* This clause of the constitution applies only to the case of a party *in office,* officially doing an act which is a wilful neglect of duty, or a *misdemeanor,* and has no application to the case of a party *failing to qualify.* How could you indict *Dowling* under this provision of the constitution? If he fails to give the bond he is *out of office,* and can be guilty of no misdemeanor *as clerk;* for on the moment the thirty days had expired he was not *in office as clerk.* If, upon his election, *Dowling* had not given bond at all, and had gone into office, he could not, according to the argument on the other side, be removed, except upon *conviction in a court of law.* He would thus be in office and have control of the public revenue without any *bond at all.* Such cannot be the construction of the constitution. There are other modes of *vacating* an office than by *wilful neglect* or misdemeanor in office. Suppose Dowling had *left the State,* or suppose he was *dead,* would not the judge have the power to fill the *vacancy?* In the case of *Thomas vs. Owens,* 4 *Md. Rep.,* 224, this court has said, in reference to the offices of comptroller and treasurer, that they are to "qualify according to *existing laws,* liable, however, to any demand the Legislature might thereafter make on them; and on their failure to comply *therewith,* to be deemed as having *resigned their offices.*" I refer also to the case of *Parker vs. Overman,* in

the Supreme Court of the United States, at its December term 1855, as a full warrant for the action of the court below in this case, and submit that both the orders appealed from should be affirmed.

*Chas. F. Mayer* for the appellant, in reply, argued:

1st. That the act of 1856, ch. 286, is unconstitutional in assuming to define or superadd a *disqualification* within the meaning of the constitution, if there be such term, actually or constructively, as *disqualification*, as to clerks, in the constitution, or if it be convertible with cause of *forfeiture of office*. The legislature is not authorised to interpret the constitution. It is unconstitutional, too, in not only adding, if it be construed to mean any imputation of delinquency, a cause of forfeiture of office, but in making, too, an act of omission, *per se*, a transgression. The constitution declares, that the clerk, on *conviction* in a *"court of law,"* of *"wilful neglect of duty,"* or *"other misdemeanor,"* shall be *"subject to removal,"* and, but for that particular exposure to *forfeiture* for *such a cause*, shall hold *his office for six years*. There is no other cause of forfeiture that the constitution contemplates, or that can constitutionally be attached to the office of clerk. The removal, there, is part of the sentence of the court before whom the conviction occurs, and is to be pronounced only by that court. *People vs. Barker*, 3 *Cowen*, 686, and 20 *Johns.*, 457.

2nd. Not only must the declaration of forfeiture be a judicial act, but the act entailing the forfeiture must be formally and distinctively established as any penal charge, and judicially, and in the course of criminal procedure, with privilege of jury trial. An office, whether emanating from the people's suffrage by election, or conferred by direct commission from the State, as by patent of the English Crown, must be avoided by procedure of as high a nature as the patent matter of record. Here, *without proof of any kind*, and with a denial of *wilful neglect*, the judge summarily excludes even the privilege of testimony, and pronounces for the guilt of the appellant on what he, *ex mero motu*, receives as an authentic letter from the comptroller, who repudiates the bond, in part, for a

defect which is the fault of the judge himself. *5 Coke*, 109, *Foxley's Case*. 4 *Bac. Abr.*, 342, *tit. "Forfeiture," Letter B.* 7 *Do.*, 322, *title "Officer & Office."* 10 *Viner's Abr.*, 140, 141. 16 *Do.*, 80, 81, 83. 13 *Do.*, 451. 1 *Hawk. P. C.*, 68, *ch. 27, sec. 9.* 1 *Chitty's Pl.*, 302, *Statutes 5th & 6th, Ed. 6th, ch. 11, sec. 9.* 26 *Henry 8th, ch. 13, sec. 4.* 33 *Henry 8th, ch. 20, sec. 3.* 2 *Chitty's Bl.*, 199. 8 *Coke*, 14, *Prince's Case. Dyer*, 198, *Rex vs. Eston. Ibid.*, 211, *(a,) Sir Robert Chester's Case. Sid.*, 81, *Beere vs. Windebanke.* 2 *Term Rep.*, 554, 557, *King vs. Amery.* 10 *Wend.*, 266, *Fire Department vs. Vip.*

3rd. The constitution makes all laws applicable to the new clerks of the courts that attached to the clerks of the county courts until other laws, *in pari materia*, be passed. It is only under that provision that the legislature could exact new bonds under any terms; but those prior laws did not make the failure to give bond a cause of forfeiture of office, nor, *per se*, a penal offence. And it might well be doubted whether any such consequences could, by new legislation, be affixed to omissions to give bonds, even if a conviction in a court of law were required, and it was necessary to convict the party for the case of the omission of *"wilful* neglect of duty." *Const.*, *Art. 4, secs.* 14, 16, 24. *Art. 1, sec. 4. Acts of* 1800, *ch.* 62, *sec.* 3. 1716, *ch.* 1, *sec.* 3. 1742, *ch.* 10, *secs.* 2, 4. 1823, *ch.* 195. 1840, *ch.* 52. 1853, *ch.* 409. 1856, *ch.* 286.

4th. It is not to be conceded, that the act of 1856 was passed the 8th of March, but it must be understood as passed when both branches of the Assembly *recognised* it, on the 10th of March, as *a law.* The printed volume of laws so dates the passage of the law. If that be so, the bond was presented in time, and the supplemental certificate operating, *ab initio*, the bond, as admitted by the comptroller, was adequate, and was, even on the 9th of March, good and in time. If even the suppletory amendment from the judge had not relation back to make full the certificate, the appellant could not suffer, as the omission was the act of the State herself by her own officer.

34   v.9

The Judges delivered separate opinions in the case.

LE GRAND, C. J.:

Looking to the proper interest manifested by a large portion of the community in the questions supposed to be involved in this case, and differing, as I do, in some particulars, from the opinion pronounced by my brother MASON, (which is concurred in, to a considerable extent, by my brother TUCK,) I deem it advisable to briefly indicate the views which I entertain in regard to the matter embraced by these appeals.

The case is before us on two appeals. *First,* on an appeal from an order passed by the judge of the Superior Court for Baltimore city, declaring the office of the clerk, of said court, *vacant.* And *Secondly,* from an order directing the appellant, Dowling, to surrender to the appellee, Smith, all the books, records, &c., belonging to the office of the clerk of said court.

The appellant, Dowling, in November 1851, was elected to the office of clerk of the Superior Court, and shortly thereafter gave the necessary bond, and took the oath prescribed by the constitution.

There is no question that he was properly inducted into office: that is to say, in strict conformity with the requirements of the constitution and the then existing laws. Nor is there any question as to his compliance with the act of 1853, chap. 409. If he be out of office, he is so, *only,* because of an alleged non-compliance with the act of 1856, chap. 286.

The office of clerk to the Superior Court for Baltimore city, is created by the 14th section of the 4th article of the constitution of the State. After reference to other matters, it declares: "There shall also be a clerk of the Court of Common Pleas, in Baltimore city, and a clerk of the Superior Court of Baltimore city, and there shall also be a clerk of the Criminal Court of Baltimore city; and each of the said clerks shall be elected, as aforesaid, by the qualified voters of the city of Baltimore; and shall hold his office for six years from the time of his election, and until a new election is held, and be re-eligible thereto: *subject, in like manner, to be removed for wilful neglect of duty, or other misdemeanor in office, on conviction in a court of law.*"

The 16th section, of the same article of the constitution, provides, that "All laws relating to the clerks of the Court of Appeals, clerks of the several County courts and Baltimore city court, shall be applicable to the clerks, respectively, of the Court of Appeals, the County courts, the Court of Common Pleas, the Superior Court, and the Criminal Court of Baltimore city, *until otherwise provided by law.*"

By the 14th section of the 4th article, it is provided, that "In case of a vacancy in the office of a clerk, the judge or judges of the court of which he was clerk, shall have the power to appoint a clerk, until the general election of delegates held next thereafter, when a clerk shall be elected to fill such vacancy."

It is under these clauses of the constitution, and the provisions of the act of Assembly of 1856, chap. 286, the authority is claimed for the judge of the Superior Court, to *vacate* the office of the clerk to his court.

It is manifest, from these citations, that all laws relating to clerks of the several courts, which were in force at the adoption of the constitution, continued so, and, as applicable to the clerk of the Superior Court, "until otherwise provided by law." Until the act of 1853, chap. 409, there was no attempt, since the adoption of the present constitution, to alter or modify, in any particular, (so far as bonds of clerks are concerned,) the laws existing previously thereto. Dowling entered into his office in the year 1851, and bonded. His bond was, consequently, given under the act of 1800, chapter 82. Its *condition* covered the *whole period "during his continuance in office;"* that is to say, for the period of six years, should he continue in office such a length of time.

The act of 1853, chapter 409, did not, in any wise, change the condition of the bond, which it required the clerk of the Superior Court to enter into. Its whole office was to change the amount of the penalty, and to fix the time within which, after the passage of the act, the bond required should be given. The obligation of the bond given under this act, extends over the whole period of his continuance in office, or at least, until such time as he shall give a bond, as required by the act of

1856, chapter 286.   If, therefore, the bond executed in 1853 be a good bond, the public are not without security against any neglect, or failure to discharge his official duty, by the clerk.   This is my opinion.

I entertain no doubt that it was competent to the legislature to pass, (with the exception of the 5th section,) the act of 1856, chapter 286.   The 16th section of the 4th article of the constitution, expressly authorises the legislature to alter the laws relating to the clerks: *but it does not authorise an alteration of the constitution itself*.   Did such a power exist in the legislative branch of the government there would be, in fact, no constitution.   Its provisions would depend wholly upon the wisdom or caprice of the members at each recurring Assembly.   To admit of such a power in the Legislature would be to ignore all our consecrated ideas of the protection furnished to our rights of person, liberty and property, by *Magna Charta* and our Bill of Rights, both of which provide and *guarantee*, that we shall not be dispossessed of anything, except by the judgment of our peers.

Whilst I hold, with the exception of its 5th section, the act of 1856, to be a legitimate exercise of legislative power, I am still clearly of opinion, that that section is an infraction of the organic law, and in this, that it seeks to provide for the removal of a clerk, in a manner directly in conflict with the one prescribed by the constitution.

If the legislature exact of a clerk the renewal of his bond, and he refuse to comply, such refusal is a neglect of duty, inasmuch as he is bound to conform to all laws relating to him as *clerk*, and to his office as such; and he may be convicted for the same, in a court of law, and amoved.   It is proper, however, to observe, that the mere failure to give bond, within the time prescribed, is not, *ex necessitate*, such a "*wilful*" neglect of duty as would, under every possible state of circumstances, command a conviction.   It is not every neglect of duty which will, under the constitution, justify a conviction; it must be a "*wilful*" neglect.   The importance of this word, in this connection, is made manifest by contrasting the section of the constitution, in which it is found, with the language of

the 3rd section of the 4th article. In the latter it is said: *"* The Court of Appeals shall appoint its own clerk, who shall hold his office for six years, and may be re-appointed at the end thereof; he shall be *subject to removal* by the said *court*, for incompetency, *neglect of duty*, misdemeanor in office, *and for such other causes as may be prescribed by law."*

By this part of the constitution, it will be seen, the clerk of the Court of Appeals may be removed *by the court* for *any* neglect, wilful or not; and that the power is reserved to the Legislature to prescribe other causes of removal than those specified in the constitution. This is not so in regard to the clerks of the Circuit Courts, nor of the clerk of the Superior Court, nor of the clerk of the Court of Common Pleas, nor of the clerk of the Criminal Court. So far as they are concerned, the judge of the particular court has no power to remove; they must be convicted "in a court of law;" and if the conviction be for a neglect of duty, such neglect must be "*wilful,*" and of the wilfulness in the particular instance, the jury must be the judges.

The distinction in the constitution, between the power of the judges of the Court of Appeals over their clerk, and that of the judges of the other courts over their clerks, is obvious and broad, and we cannot but hold, that to the convention which framed the instrument it was apparent, and was by it intended to be so.

The fact is, the constitution, in regard to nearly all the officers recognized by it, points out the manner, mode and causes of removal; and it is a well settled principle of construction, that where a right or franchise is conferred, subject to be divested in a manner *specified,* the manner so designated must be pursued. It is to such cases the maxim, *expressio unius est exclusio alterius,* properly applies. And so, accordingly, it has been frequently held, both by courts of law and legislative bodies, that where certain qualifications are specified, as those constituting the right of a party to hold and enjoy an office, and no power by the constitution be reserved to the legislature to add to or take away therefrom, the enumerated requisites are all that can be insisted upon. I agree with my brother

Eccleston in what he has said in regard to the action of the Superior Court. The matter was *coram non judice,* and, therefore, of non-effect.

The result of the opinion pronounced by the judges of this court is, that the orders of the Superior Court, in the premises, be reversed.

*Order reversed.*

ECCLESTON, J.:

Although the clerk of the Superior Court of Baltimore city may have failed to procure the approval of his official bond, according to the provisions of the act of 1856, ch. 286, within the time prescribed by that act, still I do not think, that for such failure, the judge of the court had the right to declare the office vacant, and to pass the orders which he did, for the purpose of filling the vacancy. The language of the act must be construed with reference to the provisions of the constitution on the subject; and, in my opinion, notwithstanding the failure to procure the approval of the bond in due time, the judge had no authority to treat the office as vacant whilst Dowling continued to claim it, until, for such failure, he was convicted in a court of law of "*wilful* neglect of duty" in office, according to the 14th section of the 4th article of the constitution.

Believing the action of the court below was erroneous, I think there should be a reversal, and therefore need not inquire whether the proceedings, in point of form, were irregular or not.

MASON, J.:

The main question for our determination upon the present appeal is, whether the act of 1856, chap. 286, is a constitutional exercise of power upon the part of the legislature? That act provides, that the clerk of the Superior Court of Baltimore city shall execute a bond with securities, &c., within thirty days from the passage of the law, and in the event of his not doing so, the 5th section provides, that it "shall be deemed a disqualification within the meaning of the constitution, and thereupon his place shall be filled according to the provisions

of the 14th and 18th sections of the 4th art. of the constitution." It is supposed that these requirements are inconsistent with the terms of the constitution which relate to the clerks of the several courts in this, that the act superadds a qualification, and provides a mode of removal from office not contemplated by the letter or spirit of the constitution; and this question is to depend upon the proper construction of that instrument.

The true meaning and spirit of the constitution can only be collected from an interpretation of its several parts relating to the same subject, taken in connection with each other. And in determining the constitutionality of statutes, comity requires, that acts of a co-ordinate branch of our government are never to be declared, by this court, to be unconstitutional and void, except upon the clearest conviction that they are repugnant to the organic law.

The terms of the constitution, which are to control this question, are to be found in the 14th and 16th sections of the 4th article. By the 14th section it is provided, that "there shall be a clerk of the Superior Court of Baltimore city elected as aforesaid, by the qualified voters of the city of Baltimore, and shall hold his office for six years from the time of his election, &c., subject in like manner to be removed for wilful neglect of duty, or other misdemeanor in office, on conviction in a court of law."

If this provision stood alone it might be a very grave question, whether the legislature could require any additional qualification for the clerk, such as giving a bond, inasmuch as no such qualification is enumerated in this section; but we are relieved from any difficulty upon this point, so far as the requirement of a bond is concerned, by the 16th section. That section provides, that "all laws relating to the clerks of the Court of Appeals, clerks of the several county courts, and Baltimore City Court shall be applicable to the clerks, respectively, of the Court of Appeals, the Circuit Courts, the Court of Common Pleas, the Superior Court and the Criminal Court of Baltimore city, until otherwise provided by law; and the said clerks, when duly elected and qualified according to law, shall have the charge and custody of the records and other papers belonging to their respective offices."

If there was doubt as to the previous section there is none as to this. It intended to make applicable to the clerks elected under the new constitution, so far as they might relate thereto, all the laws then in existence, relating to the former clerks; and further to empower the legislature, from time to time, to amend or repeal those laws at will. In other words, upon every subject upon which statutes were in force relating to clerks, it was the design of the constitution to empower the legislature to legislate upon the same subjects. But it was not the purpose of the constitution to authorise the legislature, under the shadow of this power, to impose new duties and qualifications not contemplated by the constitution or the then existing acts of Assembly. Among the laws relating to the former clerks, at the time of the adoption of the present constitution, were those requiring official bonds. We do not deem it necessary to go into an examination as to the precise state of the law upon this subject. It is sufficient for us to know, that the laws required bonds to be executed by the clerks, and therefore the power was vested in the legislature to regulate the subject, if it should be deemed necessary, by subsequent acts. We think it clear, therefore, that it was within the power of the legislature to pass the act of 1856, chap. 286, so far as it requires the execution of a new bond by the clerk, and for its renewal every two years. It was simply *otherwise provided by law* as to the nature of the clerk's bond.

This leads us to the consideration of other and more difficult questions, namely, whether, in case of the neglect of the clerk to give the bond as required by the act, the effect of such omission would amount, *ipso facto*, to a vacation of the office; or if not, whether the legislature has power to provide for the removal of the clerk and for the appointment of his successor in case he fails to give the bond as required.

We are of the opinion, that unless the omission to give the bond, of itself, vacated the office, the legislature had no power to confer upon the Superior Court the right *to turn the clerk out* upon any pretext or proceeding whatever, for the reason that the said 14th sec. expressly provides, that he *shall be re-*

*moved on conviction in a court of law;* and as there could be, under the constitution, no proceeding in the Superior Court in the nature of a criminal prosecution, against the clerk, there could be no conviction in that court, and, therefore, no removal. The point then is, has the clerk, by omitting to give the bond, in the spirit of the constitution and laws, actually vacated his office, in the same manner as if he had resigned, removed from the State, or the like; or has he only done, or omitted to do, an act which amounts to such a *wilful neglect of duty*, that, upon conviction of which, he forfeits his office? If the first, '' it was a case of vacancy in the office, '' and the Superior Court was right in filling the place, as is required by the aforesaid 14th section; but if it was the second, the court was wrong in attempting to fill the office before it had been made vacant by a *conviction in a court of law.*

We cannot shut our eyes to the fact, that it was the design of the constitution, and the laws existing at the time of its adoption, that this clerk should give bond, and that such bond should constitute an essential qualification for the office. It would hardly be contended, that Mr. Dowling could have entered rightfully upon the duties of his office upon the mere force of his election alone, without giving a bond under the constitution and laws as they then stood. The language of the constitution, that the clerks, ''when duly elected and qualified according to law, shall have the charge and custody of the records and other papers belonging to their respective offices, '' is equivalent to saying that they shall not act or be considered as in office until they shall have qualified; and one of the modes of qualification is giving bond. What official act could a clerk perform without having '' the charge and custody of the records and other papers '' of the office? Yet he cannot have these without first giving a bond.

In the exercise of the power conferred by the constitution, *to otherwise provide by law*, for the regulation of the bonds of the clerks, the Legislature passed the acts of 1853, chap. 409, and 1856, chap. 286. The first of these acts required a new bond to be given within thirty days after its passage, in the penalty of $30,000, and contemplated the continuance of the

35    v.9

bond during the term of office. This act, in its letter and spirit, was complied with. The act of 1856, differed substantially from the previous act, only in requiring the renewal of the bond every two years. It is not necessary, in this connection, to decide how far the bond, under the act of 1853, continues in force, notwithstanding the failure to bond under the act of 1856. It is probable it would continue in force, inasmuch as it was intended to cover the whole term of the clerk. But it is clear, that any bond executed under the act of 1856, to run for two years, could not bind the obligors on that bond for official acts done by the clerk, after the expiration of the two years, because the extent of the obligation, under the law, was for the faithful discharge of the duties of the clerk for two years only, and that obligation, by construction, cannot be enlarged. *Robey vs. Turner,* 8 *G. & J.,* 125. At the end, therefore, of the two years, if the clerk should fail to renew his bond, we would have either the office, with its records and papers, in the possession of a clerk acting without the obligations of a bond, or the office would be vacant. We have already said the constitution and laws contemplate a bond for the public security, and that the clerk could not get possession of the office until he gave such bond. Is it not virtually a contradiction, in terms, and a violation, at least, of the spirit of our system, to say, that while he cannot get into the office without first giving a bond, yet, after he does get in, the clerk may hold it without any? But it is said, he may *be convicted in a court of law,* and removed, for not giving the bond, regarding the omission to do so, as a "wilful neglect of duty, or other misdemeanor in office." During the slow process of this prosecution he·is to continue in office, perpetrating, if he pleases, all manner of wrong against the public, without any bond to protect them against the consequences of such official misconduct. But, in addition to the removal from office, as a penalty for *wilful neglect of duty, or other misdemeanor,* the law contemplates that the public, as well as individuals, shall find indemnity and redress against the clerk for such official misconduct in his bond; and it was never, therefore, the design of the constitution and laws, that there should ever be a

clerk without a bond.   The object of the bond, as has been remarked, was to afford security and indemnity against *the wilful neglect of duty, or other misdemeanor in office,* on the part of the clerks, and if it was contemplated, that there could be no clerk without a bond; neither, as a consequence, could there be any wilful neglect, or other misdemeanor in office, without a bond to cover it.   But if not giving the bond be a wilful neglect of duty, or misdemeanor in office, then there is a neglect of duty or misdemeanor not covered and provided for by the bond; and that, too, such a neglect of duty as almost to embrace within its scope and consequences every other neglect of which the clerk might be guilty; for if the clerk is himself irresponsible, and has given no bond, there is no pecuniary indemnity against his official misconduct.

The 14th section of the constitution, already cited, provides, that "in case of a vacancy in the office of a clerk," the judge may appoint the successor.   The constitution is silent as to what is to constitute such vacancy, or how it may occur.   It would certainly hardly be contended that this term would only embrace a vacancy resulting from a conviction.   If it did, death, resignation or removal from the State, could not be regarded as such vacancy.   We do not doubt for one moment that the term *vacancy* was employed in the constitution in its usual signification, and that it embraced every event or act, such as death, resignation and the like, and every other conduct from which, in legal contemplation, or actual intendment, the party is understood as having vacated the office, as well as a vacancy resulting from a conviction in a court of law.

The omission of the clerk to give the bond was equivalent to a resignation, removal from the State, or the acceptance of another inconsistent office.   He was guilty of an act of omission, as inconsistent with the tenure of the office, as if he had accepted the office of collector of the port of Baltimore, or *bona fide* removed to California, either of which would have, beyond question, amounted to *a vacancy* within the meaning of the constitution.

In the case of *Van Orsdall vs. Hazard,* 3 *Hill Rep.*, 243, the court announce some general principles quite applicable to

the case now before us.  It is there said that "a vacancy may sometimes arise from a mere implied resignation, as by accepting an office incompatible with that which is claimed to be vacant."

The clerk in this instance took his office burthened with the obligation to discharge its duties and accept its emoluments, only under the restraints and penalties of a bond, and upon the condition imposed by the constitution, that the Legislature should have power from time to time to regulate the nature, amount and duration of the bond.  If he fails to comply with the requirements of the Legislature in this particular, he is no longer clerk.  He vacates the office by his own act.  He puts himself out.  The alternative presented to the clerk is, give bond and remain in office, or omit to do so, and go out.  The proposition is a plain one, about which there can be very little room to dispute in regard to facts.  It is not a neglect of duty, or a misdemeanor within the meaning of the constitution. These may depend upon a number of contingencies, and therefore a proper subject of investigation before a jury in a court of law.

The constitution of the State of Arkansas provides, that "the qualified voters of each county shall elect one sheriff, &c., for the term of two years.  They shall be commissioned by the Governor, reside in their respective counties during their continuance in office, and be disqualified for the office a second time, if it should appear that they or either of them are in default," &c.  *Art.* 6, *sec.* 17, *Con. Ark. Dig.*, 64.

By a statute of the State, *Dig.*, 871, "the sheriff of each county shall be *ex officio* assessor for the county."  The same statute requires, that to qualify the sheriff to act as assessor, he shall, "on or before the 10th day of January in each year, make and file in the office of the clerk an affidavit, in the following form, &c., and if any sheriff shall neglect to file such affidavit within the time prescribed, *his office shall be deemed vacant*, and it shall be the duty of the clerk, without delay, to notify the Governor of such vacancy."

In the case of *Parker & others, vs. Overman,* 18 *Howard,* 137, the Supreme Court were called upon to interpret these

several provisions in the laws of Arkansas. The question was one of title to land, and depended upon the regularity of a tax sale. The objection to the sale was that the land was not *legally assessed.* Upon the point we cite from the opinion of the Supreme Court:

" The record shows, that Peyton S. Bethel, the *then* sheriff of the county of Dallas, did not file his oath as assessor on or before the tenth of January, as required by law. He did file an oath on the fifteenth of March, but this was not a compliance with the law, and conferred no power on him to act as assessor. On the contrary, by his neglect to comply with the law, his office of sheriff became *ipso facto* vacated, and any assessment made by him in that year was void, and could not be the foundation for a legal sale. The neglect also to file his assessment and give immediate notice on the 25th of March, so that the purchaser might have his appeal at the *next* county court, was an irregularity which would have avoided the sale, even if the assessment had been legally made."

It will be seen that the office was, by the statute, (which was sustained by the court,) declared *to be vacant* upon the omission to make the affidavit. In the case before us the statute declares the office vacant upon the failure *to give the bond,* and as our constitution contemplates by its express provisions, that a bond shall constitute an essential element in the qualification of a clerk, and as the constitution of Arkansas is silent upon the subject of the sheriffs making any affidavit, the case decided by the Supreme Court is even stronger than the one we are now considering. In both cases the *act of omission* to comply with the law, is not regarded or treated as a ground for *removal* from office, but as constructive evidence of an actual abandonment of the office by the incumbent.

There is nothing in the judicial decisions of our own State repugnant to the views expressed in this opinion, but, on the contrary, they rather tend to sustain them. 6 *Har. & John.,* 96. 7 *G. & J.,* 253. 8 *Ibid.,* 125. 9 *Ibid.,* 15.

The suppositive case, that the Legislature might impose upon the several clerks duties or obligations in giving bonds or otherwise, which it might be impossible or wrong for them to

comply with, is not this case.   We are not to strain our vision
to find improper or corrupt motives in the Legislature for the
passage of any law.   It is our duty to enforce acts of Assembly
whenever we can.   But where we find acts or duties imposed
upon public officers or individuals by the Legislature, which
it would be impossible for them to perform, or wrong to respect,
a different-state of case would be presented than the one now
before us, and when such does arise we shall be prepared to
act.   In the law before us, we can discover nothing that is
unjust or unreasonable.   Indeed it is almost a copy of the act
of 1853, which was complied with, promptly and without
complaint, or difficulty.

The case before us presents a question of jurisdiction.   If
the question was, whether the clerk in not giving the bond
was guilty of a neglect of duty, as defined by the said 14th
sec. of the constitution, and a forfeiture of his office was the
penalty, then the Superior Court has no jurisdiction over the
subject.   But if the omission to give bond vacates the office,
then the jurisdiction belongs to the Superior Court, and the
issue of fact to be determined is simply, has the clerk failed to
give the bond?   That issue, when determined by the court
below upon the facts, is subject to be reviewed by .this court
upon appeal, and the question now is has the issue been estab-
lished?   And the same rule would apply if the question was
whether the clerk had resigned, or *bona fide* removed from
the State.

It appears from the record that the act of 1856 passed the
House of Delegates on the 7th day of March, and the Senate
on the 8th, and that it was engrossed on the 10th.   Mr. Dow-
ling's bond appears, from the statement of the judge, to have
been approved on the 8th of April, and, by the statement of
the comptroller, that it was presented to him for approval on
the next day, namely, the 9th of April.   In this aspect of the
case the question is, was the bond executed and filed with the
comptroller within the time prescribed by the act of 1856?   and
this presents the further question, at what precise point of time
does an act take effect?   If the law went into operation as
soon as passed by the Senate, the bond was not in time, but

if it takes effect only from its engrossment, then it was in time and the act of Assembly has been complied with.

I am clear the law was not perfected until it had been engrossed. It is not necessary to examine how far a law would be defeated for want of engrossment, but we are not to assume that such omissions or neglect of duty would occur, but we must assume that all things will be done, and rightfully done, which the law requires. I only say that notice of the existence of a law, penal in its character, can only be imputed to persons interested therein, from the date of its engrossment.

It would be unjust to require any party to know the existence of a law while it is in its crude state previous to engrossment. When amendments have been made, or rejected, pending a bill, it becomes a matter of importance, in order to understand precisely the true purport of the enactments which may have been adopted, that every provision should be clearly and distinctly written out in their proper order, and this is the office of *engrossment*. Till this is done the law has not been perfected.

Upon this subject, *Jefferson*, in his *Manual*, sec. 31, says: "In reducing numerous, difficult and illegible amendments into the text, the secretary may, with most innocent intentions, commit errors," &c.: and, if the secretary cannot know the contents of an act until it is engrossed, how much more difficult would it be for strangers?

After a careful examination, I have been unable to find any case deciding this very point, and therefore it must be determined, as a new question, upon general principles.

Formerly it was the practice to engross bills before their third reading, and not afterwards to receive amendments, but *Jefferson*, in his *Manual*, sec. 31, says this practice has been departed from, and bills are now amended upon their third reading and afterwards engrossed. This only shows that engrossment is an essential part of legislation. The same author says, sec. 48, that bills are to be signed by the respective presiding officers, *after the engrossment*—hence it is to be inferred that the act was not complete till engrossed. *Bouvier*, (*Law Dic.*, *Vol. 1, page* 273,) says, in regard to the proceedings of Congress, that "when a bill is engrossed, and has received *the sanction*

Dowling *vs.* Smith.

*of both houses*, it is sent to the President for his approval;" and the same is said in 8 *Bacon Abr.*, 214. From this it appears, that *after* the engrossment the sanction of both houses is necessary. In a recent case in California, *The People vs. Clark*, 1 *Cal. Rep.*, 407, the court say: "If no time be specified when a statute shall be in force, it ought to go into effect from and after its passage, that is, from and after the *point* of time when its existence is perfected." In the matter of *Richardson*, 2 *Story's Rep.*, 580, it is said by the learned judge, "If there be any choice, as to the principle of interpretation, one should think that ought to be adopted, in cases of this sort, which is most favorable to private rights and public justice;" and these remarks were made in regard to the very question now before us.

From what I have said, I am of opinion, that in point of fact, so far as we can learn from the disclosures in the record, the bond was given in time, and that the comptroller might have accepted the bond as required by the act of Assembly.

Inasmuch as there has been no default on the part of the clerk, the bond may still be approved and filed, and said approval would relate back to the day when the bond was presented by the clerk at the office of the comptroller.

Not regarding the office of the clerk to be vacant, it was an error in the Superior Court to appoint General Smith.

TUCK, J.:

I am of opinion that the judge correctly declared the office of clerk to be vacant, on his neglect to comply with the act of 1856, ch. 286, without expressing any opinion as to the constitutionality of the *fifth* section. The constitution and laws vacated the office by such omission, on the part of the incumbent, to continue his bond, which I deem necessary to his discharging its functions, and the fact of omission was a matter to be ascertained by the judge.

The office being vacant, the judge had a right to fill it, and this having been done, it was competent for him to pass an order, after the qualification of his appointee, directing the appellant to surrender the office to him.

I agree with the views expressed by my Brother MASON, on this part of the case, and think the orders appealed from should be affirmed. Differing from him as to the time when a bill passed by the Legislature becomes a law, I think the act under which these proceedings were had was consummate on the 8th of March, and that, consequently, the bond was not filed in the comptroller's office within the time limited by law.